MAXUS EXPLORATION CO., f/k/a
Diamond Shamrock Exploration
Co., Petitioner,

v.

MORAN BROS., INC., Respondent.

No. C–8984.

Supreme Court of Texas.

June 19, 1991.

Rehearing Overruled Sept. 11, 1991.

---

Kevin P. Parker, Harlow Sprouse, Amarillo, for petitioner.

Michael W. Powell, Cynthia Keely Timms, Karen F. Gray, A. Darby Dickerson, Dallas, for respondent.

## OPINION

HECHT, Justice.

At issue in this case is the enforceability of an indemnity clause in a contract between two companies, each with its principal place of business in Texas, for the drilling of an oil well in Kansas. We hold that Kansas law applies, and that the indemnity clause is valid. Accordingly, we affirm the judgment of the court of appeals.

### I

Moran Bros., Inc. agreed to drill an oil well in Kansas for Diamond Shamrock Exploration Co., now Maxus Exploration Co. Moran, a Texas corporation, and Diamond Shamrock, a Delaware corporation, negotiated their contract in Texas, where each has its principal place of business. Using a standard form "Daywork Drilling Contract" published by the International Association of Drilling Contractors, Diamond and Moran each agreed to indemnify the other against bodily injury claims by its own employees and its contractors' employees, even if caused by the other's negligence. Each also agreed to support its indemnity obligation by liability insurance or to be self-insured.[1] The contract re-

---

1. The indemnity provisions of the contract with which we are concerned are as follows. "Contractor" refers to Moran; "Operator" refers to Diamond Shamrock.

    **14.8 Contractor's Indemnification of Operator:** Contractor agrees to protect, defend, indemnify, and save Operator and its joint owners harmless from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. If it is judicially determined that the monetary limits of insurance required

    hereunder or of the indemnities voluntarily and mutually assumed under paragraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum limits permitted under such law.

    **14.9 Operator's Indemnification of Contractor:** Operator agrees to protect, defend, indemnify, and save Contractor harmless from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any

quired Moran to maintain liability insurance policy with limits of $100,000 per person and $300,000 per accident. Diamond Shamrock was not required to obtain a specific amount of liability insurance, but it had policies covering 70% of each bodily injury claim over $1 million, up to $6 million.

The contract was executed, and the well drilled, in 1980. During the drilling operation, an employee of one of Diamond Shamrock's contractors, Keith Boydstun, was injured on Moran's rig. Boydstun, an Oklahoma resident whose employer was also located in Oklahoma, sued Moran in United States District Court in Kansas. Moran filed a cross-action against Diamond Shamrock for indemnity under the drilling contract.[2] Diamond Shamrock undertook to defend Moran in the litigation, each reserving any right it might have to seek indemnity or other damages from the other. Based upon a jury verdict that Boydstun had suffered $3 million in damages caused 90% by Moran's negligence, the court rendered judgment against Moran for $2.7 million. Moran then settled with Boydstun. Diamond Shamrock and its insurer paid approximately half the settlement amount and Moran paid the balance.[3] Diamond

Shamrock and Moran continued to reserve their indemnity claims against one another.

Sometime later Diamond Shamrock brought this action against Moran to determine the validity of the indemnity provisions in their agreement. Diamond Shamrock contends that those provisions are governed by Texas law, and that what is now chapter 127 of the Texas Civil Practice and Remedies Code, a statute governing indemnity provisions in certain mineral agreements, voids or at least limits its obligation to indemnify Moran.[4] Alternatively, Diamond Shamrock argues that the provisions are unenforceable under Kansas law. Kansas has no statute governing indemnity agreements but requires generally a clear and unequivocal expression of intent to indemnify a party against its own negligence, and Diamond Shamrock argues that the provisions in its contract do not meet this requirement. Diamond Shamrock seeks reimbursement from Moran for most or all of what it paid Boydstun, plus its litigation costs and expenses in defending Moran. Moran contends that the indemnity provisions are valid under both Kansas and Texas law, and seeks reimbursement of the amount it paid Boydstun.

Diamond Shamrock and Moran both moved for summary judgment. The trial

---

party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors or their employees, or Operator's invitees, other than those parties identified in paragraph 14.8 on account of bodily injury, death or damage to property. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily and mutually assumed under paragraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitees, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum limits permitted under such law.

    **14.13 Indemnity Obligation:** Except as otherwise expressly limited herein, it is the intent of the parties hereto that all indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, paragraphs 14.1 through 14.12 hereof, be without limit and

without regard to the cause or causes thereof (including preexisting conditions), the unseaworthiness of any vessel or vessels, strict liability, or the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive.

2. Moran also named Diamond Shamrock's insurer as a defendant to its counterclaim.

3. Diamond Shamrock paid $1,066,640.48, and its insurer paid $155,494.47, for a total of $1,222,134.95. Moran paid $1,224,134.95.

4. This statute, formerly Tex.Rev.Civ.Stat.Ann. art. 2212b, was originally enacted in 1973, Act of May 21, 1973, 63rd Leg., R.S., ch. 646, 1973 Tex.Gen.Laws 1767, and amended in 1979, Act of May 7, 1979, 66th Leg., R.S., ch. 237, 1979 Tex.Gen.Laws 511. Article 2212b was recodified as chapter 127 of the Civil Practice and Remedies Code in 1985, Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex.Gen.Laws 3242, 3319–3320, and amended again in 1989, Act of May 28, 1989, 71st Leg., R.S., ch. 1102, 1989 Tex.Gen.Laws 4557.

court granted Moran's motion to take judicial notice of Kansas law; it also denied Diamond Shamrock's motion for summary judgment and granted Moran's, upholding the indemnity provision.[5] The court of appeals affirmed, holding the indemnity agreement valid under Texas law, which it assumed applied. 773 S.W.2d 358.

## II

We consider first whether the indemnity provisions of the drilling contract are governed by Texas or Kansas law. In deciding which state's law should govern the construction of contractual rights we have previously looked to the principles stated in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) [hereinafter the Restatement]. *DeSantis v. Wackenhut*, 793 S.W.2d 670, 679 (Tex.1990), *cert. denied*, — U.S. —, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex.1984). We look to those principles again here.

### A

Comment b to section 173 of the Restatement states: "The existence of a contractual right to indemnity, and the rights created thereby, are determined by the law selected by application of the rules of §§ 187–188." When the parties to a contract, as in this case, have not themselves chosen what law is to govern their agreement, section 188(1) of the Restatement states the general rule: "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Section 188(2) lists the contacts comprising the relationship between transaction and locale ordinarily to be taken into account in applying the principles in section 6. These include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." We agree that the general rule in section 188 controls the choice of law governing contractual rights and duties, *see DeSantis*, 793 S.W.2d at 678–79, and that these include indemnity agreements.

With respect to certain specific transactions, the Restatement indicates how the contacts listed in section 188(2) should be evaluated. In the case of a contract for the rendition of services, section 196 accords the place of performance paramount importance. *DeSantis*, 793 S.W.2d at 679. Section 196 states:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*See also Castilleja v. Camero*, 414 S.W.2d 424, 426 (Tex.1967) ("A contract which is made in one jurisdiction but which relates to and is to be performed in another jurisdiction is governed by the law of the place of performance ..."); *Gorsalitz v. Olin Mathieson Chem. Corp.*, 429 F.2d 1033, 1048 (5th Cir.1970) ("the interpretation of a contract executed in Texas but to be performed wholly outside the state is governed by the law of the place of performance"). The several virtues of this rule, when applicable, are explained in comment c to section 196:

> The rendition of the services is the principal objective of the contract, and the place where the services, or a major portion of the services, are to be rendered will naturally loom large in the minds of the parties. Indeed, it can often be as-

---

5. Moran also sued Diamond Shamrock for breaching its duty to reach a reasonable settlement of Boydstun's claim. The trial court sev- ered this claim from the main action, making the summary judgment for Moran final.

sumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the services, or a major portion of the services, are to be rendered would be applied to determine many of the issues under the contract. The state where the services are to be rendered will also have a natural interest in them.... The rule of this Section also furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the place where the contract requires that the services, or a major portion of the services, are to be rendered will be readily ascertainable, of ease in the determination of the applicable law.

■ The contract before us involved services associated with drilling an oil well. Nearly all such services were contemplated by the parties to be rendered, and were actually rendered, in Kansas where the well was drilled. Taken as a whole, the contract was performable almost entirely in Kansas. "As a rule, that factor alone is conclusive in determining what state's law is to apply." *DeSantis*, 793 S.W.2d at 679. In some instances, however, it is more appropriate to consider the disputed contractual issue separately from the contract as a whole. *See* Restatement Title C, *Particular Issues*, at 631–32 (although "most issues involving a contract will usually be governed by a single law," occasionally "an approach directed to the particular issue, rather than to the kind of contract involved, will provide a more helpful basis for the decision of a choice-of-law question"). Even assuming that the indemnity obligations in the agreement should be considered separately, they were also performable, at least for the most part, in Kansas, where Diamond Shamrock, pursuant to those obligations while reserving the issue of their validity, defended Moran in the Boydstun litigation. Thus, following section 196 of the Restatement, we conclude that Kansas law should be applied to determine the parties' rights under their con-

tract unless, with respect to the validity of the indemnity provisions, some other state has a more significant relationship to the parties and their transaction under the principles in section 6 of the Restatement.[6]

Section 6 provides that absent a statutory directive concerning the law to be applied in a case, "the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Before we can evaluate these factors, we must first examine the differences between Texas and Kansas law as raised by the parties.

B

The parties raise two principal differences between Texas and Kansas law pertaining to the enforceability of indemnity provisions like those before us. One difference is that Texas has a statute governing indemnity provisions in certain mineral agreements and Kansas does not. The Texas statute, formerly Tex.Rev.Civ.Stat. Ann. article 2212b, is now chapter 127 of the Civil Practice and Remedies Code. *See infra* note 4. Section 127.002 of that chapter states:

(a) The legislature finds that an inequity is fostered on certain contractors by the indemnity provisions in some agreements pertaining to wells for oil, gas, or water or to mines for other minerals.

(b) Certain agreements that provide for indemnification of a negligent indemnitee are against the public policy of this state.

---

6. Section 196 directs us to apply the "local law" of Kansas, that is, its law "exclusive of its choice of law rules." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 8 (1971), comment a. Thus, we do not consider what law a Kansas court would apply in this case.

In furtherance of the policy stated in section 127.002, section 127.003 provides:

(a) Except as otherwise provided by this chapter, a covenant, promise, agreement, or understanding contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water or to a mine for a mineral is void if it purports to indemnify a person against loss or liability for damage that:

(1) is caused by or results from the sole or concurrent negligence of the indemnitee, his agent or employee, or an individual contractor directly responsible to the indemnitee; and

(2) arises from:

(A) personal injury or death;

(B) property injury; or

(C) any other loss, damage, or expense that arises from personal injury, death, or property injury.

Section 127.003 would void the indemnity provisions before us unless they are excepted from its application by some other section of chapter 127.

The only such exception asserted by Moran is that contained in section 127.005. Before it was amended in 1989, that section stated:

(a) This chapter does not apply to an agreement that provides for indemnity with respect to claims for personal injury or death to the indemnitor's employees or agents or to the employees or agents of the indemnitor's subcontractors if the parties agree in writing that the indemnity obligation will be supported by available liability insurance coverage to be furnished by the indemnitor.

(b) The indemnity obligation is limited to the extent of the coverage and dollar limits of insurance the indemnitor has agreed to furnish.

(c) The amount of insurance required may not exceed 12 times the state's basic limits for personal injury, as approved by

the State Board of Insurance in accordance with Article 5.15, Insurance Code. The parties agree that at all times material to this case the basic limits referred to in section 127.005(c) were $25,000. Thus, the limit which section 127.005(c) imposed on the amount of insurance that could be required was $300,000.

Diamond Shamrock argues that the exception in section 127.005 is inapplicable because its agreement with Moran did not call for their indemnity obligations to be "supported by available liability insurance coverage to be furnished by the indemnitor", but rather allowed those obligations to be "supported either by available liability insurance ... *or voluntarily self-insured, in part or whole*". *See infra* note 1. Diamond Shamrock argues that section 127.005(a) does not permit self-insurance but requires a liability policy of insurance. Moran counters that section 127.005(a) does not prohibit self-insurance, which should be an acceptable form of "coverage". In response, Diamond Shamrock contends that even if the validity of indemnity provisions is preserved by section 127.005, its liability is limited by section 127.005(c) to $300,000.[7] Moran argues that this limit does not apply when, as here, the parties have voluntarily agreed to indemnify one another without limit.

Further complicating the parties' contentions, section 127.005 was amended in 1989 to read as follows:

(a) Except as to agreements with respect to the purchase, gathering, storage, or transportation of oil, gas, brine water, fresh water, produced water, petroleum products, or other liquid commodities, this chapter does not apply to an agreement that provides for indemnity if the parties agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor.

---

**7.** Thus, Diamond Shamrock claims reimbursement of the full amount it paid Boydstun, $1,222,134.95, plus reimbursement of the $39,238.76 cost of defending Moran in the Boydstun litigation. Alternatively, Diamond Shamrock claims reimbursement of defense costs plus $1,066,640.48, asserting that it was liable to Moran for only $155,494.47, the amount supported by its insurance (70% of the amount over the $1 million). As a further alternative, Diamond Shamrock claims reimbursement of defense costs plus $922,134.95 ($1,222,134.95 minus the statutory maximum of $300,000).

(b) With respect to a mutual indemnity obligation, the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to provide in equal amounts to the other party as indemnitee.

(c) With respect to a unilateral indemnity obligation, the amount of insurance required may not exceed $500,000.

Section 127.001 was also amended to add the following definitions:

(2) "Mutual indemnity obligation" means an indemnity obligation in an agreement pertaining to a well for oil, gas, or water or to a mine for a mineral in which the parties agree to indemnify each other and each other's contractors and their employees against loss, liability, or damages arising in connection with bodily injury, death, and damage to property of the respective employees, contractors or their employees, and invitees of each party arising out of or resulting from the performance of the agreement.

(5) "Unilateral indemnity obligation" means an indemnity obligation in an agreement pertaining to a well for oil, gas, or water or to a mine for a mineral in which one of the parties as indemnitor agrees to indemnify the other party as indemnitee with respect to claims for personal injury or death to the indemnitor's employees or agents or to the employees or agents of the indemnitor's contractors but in which indemnitee does not make a reciprocal indemnity to the indemnitor.

With respect to these amendments, the Legislature provided: "This Act applies to an indemnity obligation without regard to whether the obligation was entered into before, on, or after the effective date of this Act [which was September 1, 1989]." Act of May 28, 1989, 71st Leg., R.S., ch. 1102, § 4, 1989 Tex.Gen.Laws 4557, 4559.

Diamond Shamrock argues that the 1989 amendments to chapter 127 cannot constitutionally be applied retroactively, notwithstanding the Legislature's expressly contrary intention.[8] Alternatively, Diamond Shamrock argues that the indemnity obligations are not "mutual" as defined in section 127.001(2) because the parties did not agree, in the language of the definition, to indemnify "each other's contractors and their employees". Even if the indemnity provisions here are "mutual", Diamond Shamrock argues, its obligation is limited to the $100,000 of insurance coverage Moran was required by their contract to obtain. Moran contends that the indemnity provisions are mutual and the obligations imposed unlimited.

The second difference the parties raise between Texas and Kansas law is that Texas law requires that an agreement to indemnify another for his own negligence must be "express", *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex.1990), *Atlantic Richfield Co. v. Petroleum Personnel, Inc.*, 768 S.W.2d 724, 725 (Tex.1989), *Singleton v. Crown Central Petroleum Corp.*, 729 S.W.2d 690 (Tex.1987), *Gulf Coast Masonry, Inc. v. Owens–Illinois, Inc.*, 739 S.W.2d 239 (Tex.1987), *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705 (Tex.1987), while Kansas law requires that the agreement be "clear and unequivocal", *Bartlett v. Davis Corp.*, 219 Kan. 148, 547 P.2d 800, 807–10 (1976), *Butters v. Consolidated Transfer & Warehouse Co.*, 212 Kan. 284, 510 P.2d 1269, 1273–74 (1973). Diamond Shamrock agreed to indemnify Moran against all bodily injury, death and property claims by its employees or the employees of its contractors "without limit and without regard to the cause or causes thereof or the negligence of any party or parties". *See infra* note 1. This exact language has been held to indemnify a party clearly and unequivocally against its own negligence. *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 539–41 (5th Cir. 1986) (applying federal maritime law). We agree that the language meets the clear and unequivocal standard. We also think that it meets the requirement of Texas law that the indemnity agreement be express. The agreement unmistakably obliged Dia-

---

**8.** In view of the result we reach, we express no opinion on the retroactivity of the 1989 amendments.

mond Shamrock and Moran to indemnify one another for the other's own negligence.

Thus, while the degree of certainty to which the indemnity provisions in issue are subject differs under Texas and Kansas law, they meet the standards imposed by both jurisdictions. The only effective difference between the two states' law remaining is the existence of a statute expressing public policy in Texas; and the absence of any such statute or policy in Kansas. With this difference in mind, we now return to the principles of section 6 of the Restatement.

### C

Of the seven choice-of-law principles in section 6, four militate rather clearly, we think, in favor of applying Kansas law in this case: the protection of justified expectations; certainty, predictability and uniformity of result; ease in the determination and application of the law to be applied; and the basic policies underlying the particular field of law. The latter points to the general choice-of-law rule for contracts. Restatement § 173 comment b, § 188. Each of the first three is invoked by the Restatement in support of the rule favoring application of the law of the place of performance to contracts for the rendition of services generally. Restatement § 196 comment c. And each supports application of that rule in this case. Although the parties did not express a choice of what state's law would govern their agreement, they should have expected that Kansas law would at least be invoked. Kansas law was in fact applied in Boydstun's personal injury action. Although a state may have an interest in applying its law to a particular issue arising under a contract, in circumstances like these it is less desirable that Kansas law govern Boydstun's action and Texas law govern the defendants' cross-claims than it is that the same law govern both. Had Diamond Shamrock and Moran not agreed to reserve their indemnity claims, the federal court in Kansas would have been required to determine them in the Boydstun litigation. Kansas law is easily determined and applied.

One section 6 principle, the needs of the interstate and international systems, is not implicated much, if at all, in this case. The parties have not identified any such needs pertaining to the issue in this case, and we are not aware of any.

■ The two remaining principles to be considered—the relevant policies of Texas and Kansas, and the relative interests of each in determining the validity of indemnity agreements like the one before us—do not point in a single direction in this case. Texas clearly has formulated a policy, statutorily expressed, pertaining to such indemnity agreements. Kansas has no such policy that we can ascertain. One can argue that the Texas Legislature's purpose in enacting chapter 127 is to protect Texas *contractors* who work on mineral wells and mines wherever they may be situated, but we think it more plausible that it had the more limited objective of protecting contractors who drill wells in Texas. We do not read the statute to have an extraterritorial reach, absent some agreement between the parties. *See* TEX.CIV.PRAC. & REM.CODE § 127.002(a).

In deciding what state's law will govern an agreement like the one here, all relevant factors, including all those set out in section 6 of the Restatement, must be evaluated. On balance, those factors require the application of Kansas law in this case.[9]

### III

■ We have already considered and rejected Diamond Shamrock's sole challenge to the validity of the indemnity provisions in this case under Kansas law, namely, that they do not clearly and unequivocally state that Moran is to be indemnified against its own negligence. The issue remains whether those provisions, which we have determined to be valid, oblige Diamond Sham-

---

9. The parties do not argue, and we certainly do not think, that application of Kansas law in this case is so offensive that no Texas court should harbor this litigation. *See Castilleja*, 414 S.W.2d at 427; R. WEINTRAUB, COMMENTARY ON THE CONFLICT OF LAWS § 3.6 (1986); R. LEFLAR, L. MCDOUGAL III & R. FELIX, AMERICAN CONFLICTS LAW § 45 (1986); E. SCOLES & P. HAY, CONFLICT OF LAWS § 3.15 (1982).

rock to indemnify Moran for Boydstun's claim.

■ In paragraph 14.9 of its agreement with Moran, Diamond Shamrock agreed to indemnify Moran against claims in favor of Diamond Shamrock's "employees or [its] contractors or their employees, or [its] invitees, other than those parties identified in paragraph 14.8". *See infra* note 1. "[T]hose parties identified in paragraph 14.8", which states Moran's obligation to indemnify Diamond Shamrock, are Moran's "employees or [its] subcontractors or their employees, or [its] invitees". Although Boydstun worked for one of Diamond Shamrock's contractors, Diamond Shamrock contends that Boydstun was also Moran's invitee at the well site. As an invitee, Boydstun is among the persons listed in paragraph 14.8 and thereby excluded from the group in paragraph 14.9 against whose claims Moran is entitled to indemnity.

Assuming that Boydstun was Moran's invitee, a matter which the parties dispute, we think that Diamond Shamrock's argument is untenable. If Boydstun was Moran's invitee, so were all employees of Diamond Shamrock's contractors, as well as all Diamond Shamrock's own employees, for that matter. To read the exception for Moran's invitees in paragraph 14.9 so broadly causes it to swallow up the entire indemnity obligation there created. We decline to give these provisions so unreasonable a construction when a more sensible one suggests itself.

Despite the comma preceding the "other than" language in paragraph 14.9, we think it refers only to Diamond Shamrock's invitees and not to its employees or subcontractors or their employees. It simply makes no sense to read paragraph 14.9 as applying to Diamond Shamrock's employees "other than" Moran's employees. While it is not impossible that a person employed by Diamond Shamrock could also be employed by Moran, it is certainly most unlikely. It makes no more sense to apply paragraph 14.9 to Diamond Shamrock's contractors' employees "other than" Moran's contractors' employees. Again, while not absolutely impossible, it is most im-

probable that a person employed by one of Diamond Shamrock's contractors would also be employed by one of Moran's contractors. It does make sense, however, to limit Diamond Shamrock's indemnification to its invitees "other than" Moran's employees, Moran's contractors, and their employees. Without such an exclusion, Diamond Shamrock might well be assuming the obligation to satisfy the claims of all persons at the well site. The apparent purpose of the cross-indemnification provisions is to make Diamond Shamrock and Moran each responsible for the claims of the people it has itself brought to the well site. Thus, as we construe paragraph 14.9, Boydstun is not excluded from the group for whose claims Diamond Shamrock is responsible. We acknowledge that this construction does not solve all the problems with the "other than" language. It does not, for example, answer the question of whether Diamond Shamrock or Moran is responsible for an injury to an invitee of both. The provisions do not admit of a certain and completely consistent construction. Ours here is sufficient to resolve the issue raised.

We therefore hold that Diamond Shamrock is obligated to indemnify Moran against Boydstun's claim.

\* \* \*

The court of appeals was correct in affirming the summary judgment for Moran, although it should have applied Kansas law rather than Texas law. Accordingly, the court of appeals' judgment is affirmed. We express no opinion on whether the indemnity provisions at issue would be valid under Texas law.